ROBERT C. OVERBY v. LUCILLE J. OVERBY.

(Filed 2 February, 1968.)

**1. Divorce and Alimony § 13—**

In the husband's action for divorce on the ground that he and his wife had lived separate and apart continuously for a period of one year next preceding the institution of the action, the husband is not required to establish that he is the injured party, G.S. 50-6, and the sole defense to the husband's right to divorce on such ground is that the separation was caused by the husband's wilful abandonment of her, which defense the wife must allege and prove.

**2. Same—**

In an action for absolute divorce under G.S. 50-6, appellant's contention that the trial court should have instructed the jury that abandonment imports wilfulness *is held* without merit.

**3. Husband and Wife § 14—**

An instruction to the jury that if the wife furnishes the entire purchase price of land from her own and separate funds and has the conveyance deeded to the wife and husband jointly, then the husband would be declared to hold the land in trust for the benefit of the wife, *held* to give the wife a more favorable instruction than she is entitled, and her exception thereto cannot be sustained.

**4. Evidence § 31—**

The testimony of a bank officer as to the manner in which a wife and husband deposited their pay checks and in which they made payments on various loan accounts, such transactions being within the personal observation of the officer, does not contravene the best evidence rule when the testimony was not offered to prove the contents of any writing or document.

**5. Banks and Banking § 4; Gifts § 2—**

　　The fact that a wife deposited in her individual bank account funds borrowed jointly by the husband and wife does not create the presumption that the husband intended the funds ·to be a gift to the wife, and a special instruction to that effect is properly refused by the trial court.

APPEAL by defendant from *Brock, S.J.,* 15 May 1967 Civil Session of MOORE.

This is an action for divorce on the ground of separation for one year. Defendant pleaded abandonment by plaintiff. In a further answer she alleged that two lots had been purchased during the marriage with her sole and separate property, and that title had been taken in the names of plaintiff and defendant as tenants by the entirety. She further alleged that she had furnished money and property of the total value of $1,800 as down payment on a mobile home purchased during the marriage and that the mobile home had been repossessed and sold for failure of plaintiff to maintain payments. Defendant asked that plaintiff's action as to her be dismissed, that she be awarded the two lots owned by them as tenants by the entirety, that she be allowed support and counsel fees *pendente lite,* that she be awarded permanent support, and that she recover judgment against plaintiff in the amount of $1,800.

Five issues were submitted to the jury. The first three issues relating to the marriage of plaintiff and defendant, residency of plaintiff, and separation of the parties for more than one year were answered "Yes." The fourth issue — "Did the plaintiff abandon the defendant as alleged in the Cross Action?" — was answered "No." The jury likewise answered both parts of the fifth issue "No." These were: "Did the defendant pay the purchase price of the Whispering Pines lot from her separate funds as alleged in the Cross Action?" and "Did the defendant pay the purchase price of the Tranquil Harbour lot from her separate funds as alleged in the Cross Action?"

The court entered judgment granting plaintiff an absolute divorce and denying the relief sought by defendant in her counterclaim and cross-action. The court further adjudged that the lots in controversy be held by plaintiff and defendant as tenants in common. Defendant appealed.

　　*Watkins and Edmundson by R. Gene Edmundson, and Johnson, Johnson and Poole by Samuel Poole for defendant appellant.*

　　*Seawell, Van Camp & Morgan by James R. Van Camp and William J. Morgan for plaintiff appellee.*

PARKER, C.J. There is no controversy as to the first three issues. The court did not submit an issue as to defendant's claim for

the $1,800 allegedly paid by her on the mobile home and the record shows no exception to this determination. Defendant's assignments of error relate to the evidence and charge on the questions of abandonment and entitlement to the lots.

Appellant assigns as error the failure of the court to charge the jury that if the plaintiff abandoned the defendant, he was not entitled to a divorce from her, and failure of the court to instruct the jury that abandonment imports willfulness. The record shows the following evidence relating to these questions.

Plaintiff and defendant were married in November, 1957. Both were residents of Moore County. No children were born of the marriage. At the time of the marriage, plaintiff was a part-time employee at McCain, North Carolina. Approximately six months later, he got a job in Burton, South Carolina, 240 miles away from McCain. He worked there for a year and a half. At the end of this period, he returned to work at McCain, sometime in 1960. While working in South Carolina, he usually came home on week ends.

In the fall of 1960, they purchased a house trailer and lived in it together in the country near McCain. Defendant was employed by the State of North Carolina as a nurse and worked at the McCain Sanatorium. On 25 July 1962, she was transferred to Butner, North Carolina, to work in the John Umstead Hospital. Defendant had living quarters at Butner. Plaintiff continued to live in the house trailer at McCain and to work at McCain for three or four months after defendant had moved to Butner. He was then transferred to a job on the North Carolina coast. In January, 1963, he was transferred to Morganton, North Carolina. After defendant moved to Butner, plaintiff would visit her there on week ends and holidays. The defendant visited plaintiff at McCain several times prior to his transfer to the coast.

In July, 1963, while plaintiff was employed in Morganton, he visited defendant in Butner and suggested that they enter into a separation agreement. Defendant's response to the proposal, as testified to by her, was: " 'I'll sign the separation papers, but, Bob, are you sure, is this what you want, that I'd rather you wouldn't do it.' I sit and talked with him for quite a while and I said, 'If you are sure that's what you want, and that's the you you feel, I'll sign separation papers.' I never did sign separation papers because he never brought them to me to sign. That was the last time I saw Mr. Overby."

Plaintiff testified to several encounters with the defendant's former husband. One such occasion was described as follows: "The next time I saw him there was about a year later, if I recall right. I went to work one morning and had to pay my car insurance and I realized

I had left the papers at home, so I asked to be off to go pay the insurance and I went to the house to get my papers and when I drove up his car was sitting there again, and when I walked in he was sitting at the table eating breakfast with her. That was around 8:30." Again, testifying as to marital difficulties, plaintiff said: "I found out she was having men visitors and I came in one time and didn't park my car in the yard. I left it over across from the trailer behind some shrubbery and I was there about five minutes when this guy came in and I talked to her later about it and told her that I couldn't put up with those things. I found some letters too, and she told me one day if I didn't like it I could get out. It was the following May that she came and told me that she was out of a job at McCain and we talked about it and she told me she wanted to keep working for the State. I didn't want her to go off at Butner. That was the only chance of continuing her work for the State so she went on and stayed there." In partial explanation of his reasons for desiring a separation agreement plaintiff stated: "I went up there to get her to sign separation papers and told her I didn't want to live with her ex-husband around and other men coming around. That is my reason for it."

On the question of abandonment the court instructed the jury, in part, as follows:

"Members of the jury, there is no hard and fast rule that I can give you to determine or define exactly what constitutes abandonment of one spouse by the other, but generally speaking neither spouse is justified in withdrawing or leaving the other unless the conduct of the other is such as would likely render it impossible for the withdrawing spouse to continue the marital relation with safety, with health, or with self-respect. Otherwise, members of the jury, the separation of the parties would have to be mutual consent. In other words the law would not allow one to withdraw wilfully from the other without just cause or provocation and then come into court and seek a decree of absolute divorce based upon his or her own wrong.

\*          \*          \*

". . . I instruct you that if the defendant, Mrs. Overby, has satisfied you by the greater weight of the evidence that the plaintiff, Mr. Overby, wilfully discontinued living with her as husband and wife, and that he did this without just cause or adequate provocation from her, then it would be your duty to answer the fourth issue in favor of the defendant."

In an action by the husband against his wife for an absolute divorce under G.S. 50-6 on the ground of separation for the required statutory period, he is not required to establish that he is the injured party. If he alleges and establishes that he and his wife have lived separate and apart continuously for the required statutory period, one year or more next preceding the commencement of the action, her only defense is that the separation was caused by his act in willfully abandoning her. The wife must allege and establish his willful abandonment as an affirmative defense. *Pickens v. Pickens,* 258 N.C. 84, 127 S.E. 2d 889; *Taylor v. Taylor,* 257 N.C. 130, 125 S.E. 2d 373; *Johnson v. Johnson,* 237 N.C. 383, 75 S.E. 2d 109; *Cameron v. Cameron,* 235 N.C. 82, 68 S.E. 2d 796. The court correctly placed the burden of proof on this issue and defined abandonment in accordance with decisions of this Court. *Pressley v. Pressley,* 261 N.C. 326, 134 S.E. 2d 609; *Caddell v. Caddell,* 236 N.C. 686, 73 S.E. 2d 923; *Hyder v. Hyder,* 215 N.C. 239, 1 S.E. 2d 540. Appellant's contention that abandonment imports willfulness is, in this case, an exercise in semantics. To the contrary, abandonment requires that the separation or withdrawal be done willfully and without just cause or provocation. The phrase was used in *Workman v. Workman,* 242 N.C. 726, 89 S.E. 2d 390, in holding that a complaint in an action for alimony without divorce under G.S. 50-16 was sufficient, when liberally construed, to withstand demurrer, and has no application here. These assignments of error are overruled.

Defendant testified, in substance, as follows regarding the purchase of the lots: In the fall of 1960, "we" purchased a lot in Whispering Pines. The down payment of $500 was borrowed from the Citizens Bank and Trust Company of Southern Pines. "Mr. Overby and I both probably paid that back to the bank." The $500 was placed in defendant's individual account, and the down payment was made by a check drawn on her account. Subsequent installments were paid in the same manner. In May or June, 1960, the parties purchased a lot in Tranquil Harbour. A down payment of $30 was made, and subsequent installment payments were $10 per month. The monthly installments were paid by checks drawn on the defendant's individual account. She testified that she does not remember whether she or plaintiff made the down payment. She testified that she made "practically" all the installment payments.

Concerning the handling of family finances, the plaintiff testified as follows: "When I went to the bank to borrow money she signed the papers along with me. . . . Most of the money was deposited to her account because she wrote checks, paid the bills and I was always working and didn't have time to go off the job. So a

lot of times she would work on the night shift and had the day off, you see, and most of the time we applied the money to her account so that she could write the check for it. Some of the money that was paid on the lots at Whispering Pines and one at Tranquil Harbour came through me. I'd say half of it did. . . . Prior to 1963, I paid all the money that was borrowed at the bank. I didn't make any payments to Mr. Pruitt. The agreement between me and her was she paid the payments on all the lots. We were fifty-fifty. If I pay the bank payment and payment on the mobile home, course, what money was left I helped her with other debts. We borrowed money at the bank and deposited most of it to her account and I paid the money back. So therefore, I figure I put money in the lots."

An officer of the Citizens Bank and Trust Company of Southern Pines, N. C., described the manner in which the pay checks of plaintiff and defendant were received at the bank. He testified that Mr. and Mrs. Overby had been doing business with his bank since 1956 or 1957. He knew the parties as well as he knew his own family. He was a loan officer, and his desk was located near the teller's cage. Because of his frequent loan transactions with the plaintiff and the defendant and of his friendship with them, he frequently handled their routine deposits. He testified: ". . . (A)t the time Mr. and Mrs. Overby both had loans with our bank, each had an automobile loan and each might have had a personal loan and payments to be made on these loans and some money would be deposited to Mr. Overby's account and some money would be deposited to Mrs. Overby's account. The fact that the checks of Mr. Overby, his pay check, would be endorsed and would be presented at the bank either to be cashed and the note payment made and the deposit made to his account and maybe in some incidences (sic) I am sure . . . Some incidences (sic) money would be deposited to Mrs. Overby's account now the same is true with loan proceeds. Loan proceeds some of the loans we would have to them were joint loans and proceeds would be divided, some would go into his account and some would go into her account. I know that most of it, of course, did go to Mrs. Overby's account because she did most of the attending to the business."

During the period when monthly installment payments were being made on the two lots, there were, of course, many other family living expenses. The plaintiff was making monthly installment payments of $113 on the house trailer. The parties had charge accounts at some eight or nine stores. They had two automobiles. The joint use of their incomes to acquire family property and the interpretation placed upon the transactions by defendant are illustrated by

her testimony concerning a certain gift: "In March, 1961, I purchased a Stereo set for $700.00. It was given to me by Mr. Overby as a gift for my birthday and valentine and Easter of that particular year. I helped pay the money back some of it that was borrowed when we made the payments on it."

Appellant's major argument is that the court erred when "it failed to instruct the jury that when a wife buys a piece of land with her separate funds and has title put in the joint names of husband and wife that this raises a presumption of a resulting trust in favor of the wife which must be rebutted by the husband." Assuming that appellant's analysis of the law of Trusts is correct, *Dunn v. Dunn*, 242 N.C. 234, 87 S.E. 2d 308; *Wise v. Raynor*, 200 N.C. 567, 157 S.E. 853; *Deese v. Deese*, 176 N.C. 527, 97 S.E. 475, the court's instruction gave her more than she was entitled to. On this point, the court said in its instruction: "(I)f the wife furnishes or pays the entire purchase price from her sole and separate funds and income, the conveyance to the husband and the wife jointly creates a trust in favor of the wife in the one-half interest held by the husband, and the husband will be declared to hold the one-half interest in trust for the benefit of the wife. . . . (I)t is clear, members of the jury, that if a wife does take her sole and separate money, or income, and purchase property and has the deed made to her and her husband jointly, then under those circumstances unless there was an intended gift, and again, I instruct you that there was no evidence of any intended gift in this case, then the husband would be declared to be the holder in trust for the benefit of the wife." Thus, the court did not merely charge that the appropriate finding would raise a presumption of a resulting trust in favor of defendant. Instead, the court charged that the appropriate finding would create a trust and that the husband would be declared to be the holder in trust for the benefit of the wife. Appellant cannot complain because of an instruction that was more favorable to her position than the circumstances required. This assignment of error is overruled.

Defendant objected and excepted to admission of the testimony of the loan officer regarding his transactions with plaintiff and defendant, and argues that such admission violated the best evidence rule. This rule is based on the theory that a writing itself is the best evidence of its contents and ordinarily requires the production of the original writing itself if its contents are to be proved. 3 Strong, N. C. Index 2d, Evidence, § 31; Stansbury, N. C. Evidence, 2d Ed., § 190. The rule is not applicable if the writing is only collaterally involved, 3 Strong, N. C. Index 2d, Evidence, § 31; Stansbury, *op. cit.*, § 191, or where the contents or terms of the writing are not in

question. Stansbury, *op. cit.*, § 191; *Winkler v. Amusement Co.*, 238 N.C. 589, 79 S.E. 2d 185; *S. v. Ray*, 209 N.C. 772, 184 S.E. 836; *S. v. Casey*, 204 N.C. 411, 168 SE. 512. The bank officer's testimony did not purport to prove the specific terms or contents of any writing or document. Having handled the banking transactions of the parties, he testified from personal observation, and corroborated plaintiff's testimony that most of the family banking transactions were handled by defendant, and that some of plaintiff's money, in the form of loan proceeds and pay check proceeds, was deposited in defendant's account. This assignment of error is overruled.

Defendant, at the appropriate time, requested the following special instruction: "(I)f the jury was satisfied that the plaintiff and the defendant jointly borrowed the sum of $500.00 from the bank and that those funds were deposited in the defendant's bank account, that this created the presumption that the husband intended that these funds should be a gift to the wife and that they would become her sole and separate funds." She excepted to and assigned as error the court's denial of her motion for special instructions. She also assigned as error failure of the court "to instruct the jury that if a wife receives and uses her husband's money, there is the presumption of a gift in the absence of a contract to repay."

The court correctly refused to give the requested instruction, and also the one which appellant now says should have been given. Appellant argues, and properly so, that when a husband pays the purchase price for land and has the deed made to his wife, the law presumes that he intended the property to be a gift. 2 Strong, N. C. Index, Gifts, § 2; *Carlisle v. Carlisle*, 225 N.C. 462, 35 S.E. 2d 418. However, this Court has not extended such presumption to the case where money belonging to the husband comes into the wife's hands. Appellant relies upon *Smith v. Smith*, 255 N.C. 152, 120 S.E. 2d 575, as some authority for his contention. That case dealt with the deposit in a joint account with his wife of funds owned by the husband, and the Court held that the transaction did not constitute a gift, but that the wife had, at most, authority as agent to withdraw funds. To the extent that the principles of that case are applicable, they are contrary to appellant's contention.

Appellant cites *Shoe v. Hood*, 251 N.C. 719, 112 S.E. 2d 543. This was a negligence action, in which the injured party sought to have the negligence of the husband who was driving the car imputed to his wife who was its owner. The husband had purchased the automobile and registered the title in the name of his wife. Ownership was admitted. There being no question as to ownership, the case does not support appellant's contention.

A more analogous case is *Bullman v. Edney*, 232 N.C. 465, 61 S.E. 2d 338. In that case plaintiff alleged that she and her husband had purchased an automobile; that she paid $500 of the purchase price and her husband agreed to pay the $300 balance due, and that title in the automobile was to be taken in her name. The Court held that if this allegation were true the plaintiff and her husband became tenants in common of the automobile. These assignments of error are overruled.

All the remaining assignments of error have been carefully considered, and no error has been made to appear.

No error.